**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

BIANCA DOUGLAS,
PABLO MARTINEZ, and
FRANCES MILIAN,                                         CASE NO.: _____

                  **JURY TRIAL DEMANDED**

   Plaintiffs,

v.

CRUISE YACHT OP CO. LTD.,
*INDIVIDUALLY AND D/B/A*
THE RITZ-CARLTON YACHT COLLECTION,
DOUGLAS PROTHERO, RICHARD CARSON,
DAVID FREDERICKS, and JP SALAZAR,

   Defendants.

_____/

**COMPLAINT**

   Plaintiffs Bianca Douglas, Pablo Martinez, and Frances Milian (collectively, "**Plaintiffs**"), by their undersigned counsel, hereby complain of Defendant Cruise Yacht Op Co. Ltd., *Individually and d/b/a* The Ritz-Carlton Yacht Collection ("**RCYC**" or "**Company**"), Douglas Prothero (individually), Richard Carson (individually), David Fredericks (individually), and JP Salazar (individually), and allege as follows:

**INTRODUCTION**

   1.  This case is about a company that sought to whitewash the immutable characteristics of its employees and then terminated the employees after they complained.

   2.  Plaintiffs bring this action pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* ("**Title VII**"), 42 U.S.C. § 1981 (**"§ 1981"**), the Florida Civil

1

Rights Act of 1992, §760.01, *et seq.*, Florida Statutes ("**FCRA**"), and with respect to Plaintiff Martinez, the Family and Medical Leave Act 29 U.S.C. § 825.220 ("**FMLA**").

3.      Plaintiffs seek monetary relief to redress Defendant RCYC's unlawful employment practices in violation of Title VII, the FCRA, §1981, with respect to Plaintiff Martinez, the FMLA.

## JURISDICTION AND VENUE

4.      The Court has jurisdiction over this action under 28 U.S.C. § § 1331 (federal questions) and 1343(a)(3) (civil rights), 42 U.S.C. § 2000e-5(f)(3) (Title VII), and §1367 (supplemental jurisdiction).

5.      Venue is proper in the Southern District of Florida under 42 U.S.C. § 20003-5(f)(3) and 28 U.S.C. § 1391(b) because a substantial portion of the acts or omissions giving rise to this action occurred within the Southern District of Florida, and because Defendant Ritz-Carlton Yacht Collection is at home in the Southern District of Florida.

## PARTIES

6.      Plaintiff Bianca Douglas ("Ms. Douglas") is an individual residing in Broward County, Florida.

7.      Ms. Douglas is expressly authorized to bring this action by Sections 706(f)(1) and (3) of Title VII, 42 U.S.C. §§ 2000e-5(f)(1) and (3).

8.      Ms. Douglas is a "person" within the meaning of FCRA 760.02(6).

9.      Plaintiff Frances Milian ("Ms. Milian") is an individual residing in Miami-Dade County, Florida.

10.     Ms. Milian is expressly authorized to bring this action by Sections 706(f)(1) and (3) of Title VII, 42 U.S.C. §§ 2000e-5(f)(1) and (3).

11.     Ms. Milian is a "person" within the meaning of FCRA section 760.02(6).

12.     Plaintiff Pablo Martinez ("Mr. Martinez") is an individual residing in Broward County, Florida.

13.     Mr. Martinez is expressly authorized to bring this action by Sections 706(f)(1) and (3) of Title VII, 42 U.S.C. §§ 2000e-5(f)(1) and (3).

14.     Mr. Martinez is a "person" within the meaning of FCRA section 760.02(6).

15.     Mr. Martinez is an "eligible employee" pursuant to 29 CFR section 825.110(a)(1) because Mr. Martinez was employed by Defendant RCYC for more than 12 months, and Plaintiff Martinez was employed for at least 1,250 hours of service during the 12-month period immediately preceding exercising his FMLA rights. Mr. Martinez worked about 60 hours per week, Monday through Sunday, for at least 50 weeks during 2020-2021, meaning Mr. Martinez was employed for at least 1,250 hours during the 12-month period immediately preceding exercising his FMLA rights.[1]

16.     Defendant Cruise Yacht Op Co. Ltd., *Individually and d/b/a* The Ritz-Carlton Yacht Collection is a foreign profit corporation, registered to do business in Florida, with its principal place of business located at 1761 North Young Circle, Suite 3-345 Hollywood, Florida, and an office located at 2601 South Bayshore Drive, Suite 900, Miami, Florida 33133.

17.     Defendant RCYC is an "employer" within the meaning of FCRA section 760.02(7) and Title VII section 2000e(b).

18.     Defendant RCYC is a "covered employer" within the meaning of FMLA 29 C.F.R. section 825.104(a) because Defendant has employed more than 50 employees throughout 2021 and 2020 within a 75-mile radius of the Miami Office.

19.     Defendant Douglas Prothero is an individual, believed to be a citizen of Florida.

---

[1] Plaintiff Martinez does not have access to his timesheets maintained in RCYC's internal records. Accordingly, Plaintiff Martinez will seek such evidence during discovery.

20.     Defendant Prothero is subject to individual liability under § 1981.

21.     Defendant Richard Carson is an individual, believed to be residing in Malta.

22.     Defendant Carson is subject to individual liability under § 1981.

23.     Defendant David Fredericks is an individual, believed to be a citizen of Florida.

24.     Defendant Fredericks is subject to individual liability under § 1981.

25.     Defendant J.P. Salazar is an individual, believed to be residing in Spain.

26.     Defendant Salazar is subject to individual liability under § 1981.

<u>**ADMINISTRATIVE PREREQUISITES**</u>

27.     Plaintiffs have complied with all administrative requirements.

28.     On or about January 12, 2021, Plaintiff Bianca Douglas timely dual-filed a charge of discrimination (Charge No. 510-2021-01721) with the U.S. Equal Employment Opportunity Commission ("**EEOC**"), and the Florida Commission on Human Relations ("**FCHR**"), naming Cruise Yacht Op Co. Ltd., *Individually and d/b/a* The Ritz-Carlton Yacht Collection as the Respondent.  On or about March 15, 2021, Ms. Douglas dual-filed an amended charge of discrimination naming the same Respondent.  On or about November 1, 2021, the EEOC issued Ms. Douglas her right to sue notice.  Ms. Douglas timely commenced this action within 90 days of receiving her right to sue notice.

29.     On or about March 16, 2021, Plaintiff Pablo Martinez timely dual-filed a charge of discrimination (Charge No. 510-2021-02098) with the EEOC and FCHR, naming Cruise Yacht Op Co. Ltd., *Individually and d/b/a* The Ritz-Carlton Yacht Collection as the Respondent.  On or about November 9, 2021, the EEOC issued Mr. Martinez his right to sue notice.  Mr. Martinez timely commenced this action within 90 days of receiving his right to sue notice.

30.     On or about January 1, 2021, Plaintiff Frances Milian timely dual-filed a charge of discrimination (Charge No. 510-2021-01856) with the EEOC and FCHR, naming Cruise Yacht Op Co. Ltd., *Individually and d/b/a* The Ritz-Carlton Yacht Collection as the Respondent.  On or about March 22, 2021, Ms. Milian filed an amended charge of discrimination naming the same Respondent.  On or about November 1, 2021, the EEOC issued Ms. Milian her right to sue notice. Ms. Milian timely commenced this action within 90 days of receiving her right to sue notice.

## FACTUAL ALLEGATIONS

31.     Defendant RCYC employed Plaintiffs in the Reservations Office at the Company's location in Miami (the "Miami Team").  Ms. Douglas and Mr. Martinez were two of about a dozen sales agents, or "Yacht Vacation Consultants," while Ms. Milian was the "Sales Team Leader."

32.     The Miami Team was a diverse group of experienced sales agents, hand-selected by RCYC as top-performs in the cruise industry.  RCYC seduced Plaintiffs to work for the Company, with the rare opportunity to launch the prime of their careers at a startup luxury cruise line backed by the Ritz-Carlton brand.

33.     Ms. Douglas is a 43-year-old black woman of Jamaican national origin.  Ms. Douglas immigrated to the United States from Jamaica when her mother was pregnant with her.

34.     Ms. Douglas began working for the Company on or about August 19, 2019.  Ms. Douglas came to RCYC with two decades of experience as a sales agent working for the major lines. The Company was aware of Ms. Douglas because she had the reputation as one of the top sales agents in the cruising industry.

35.     Mr. Martinez is a 43-year-old Hispanic man of Venezuelan national origin.  Mr. Martinez immigrated to the United States from Venezuela in or around July of 2001.

36.     Mr. Martinez began working for the Company on or about November 12, 2019.
Mr. Martinez was a seasoned cruise agent, with twelve years of experience, notably becoming the
number one agent at Norwegian Cruise Lines.  Mr. Martinez left a lucrative position at Silversea
Cruises to join RCYC.

37.     Ms. Milian is a 50-year-old Hispanic woman of Cuban national origin.  Ms. Milian
is also a diabetic.

38.     Ms. Milian began working for the Company in or around August of 2019.  Ms.
Milian had established herself as a specialist in team-leading and sales motivation, occupying
various management and consulting positions for struggling cruise lines.  Ms. Milian supervised
about 25 agents at Norwegian Cruise Lines.

39.     Collectively, Plaintiffs worked six to seven days a week—including holidays—and
worked upwards of 70 hours per week, every week.  Plaintiffs booked cruises for a high-end
clientele from the Americas and Australia.

40.     Defendants subjected Plaintiffs to the most hostile work environment they have
ever experienced.

**RCYC's Struggles and the Foundation of a Workplace Replete with Discriminatory Intent**

41.     The RCYC has been inundated with operational setbacks since its inception.

42.     In 2017, the Company announced it would build three superyachts to break into the
ultra-luxury cruise business.  Currently, the RCYC has a 10-deck, 298-passenger superyacht in
production called *Evrima*.  However, the production process has forced the Company to delay
*Evrima*'s maidan voyage at least five times.[2]  Indeed, for restless guests, the allure of being among

---

[2] As of this filing, *Evrima* is still in production and Defendant is currently booking reservations for projected sail dates beginning in or around May of 2022.

the first to travel aboard the yacht only went so far.  Consequently, angry guests demanded refunds after their cruises were cancelled or setback second and third times.

43.     The guidance from the Company was simple: keep booking reservations. Consequently, Plaintiffs worked under the everyday pressure of selling reservations for trips they knew would never sail.  Plaintiffs began spending half of their days handling customer service matters, cooling down furious guests who have spent tens of thousands of dollars.[3]

44.     All of this gave way for the Company to reveal the worst of itself, subjecting Plaintiffs and their co-workers to the most hostile work environment they have ever experienced.

### RCYC Discriminates against Douglas because of Her Race and National Origin

45.     Mr. David Fredericks ("Fredericks") the "Director of Business Development," and "Director of Sales," held direct supervisory authority over Plaintiffs.

46.     Fredericks subjected Ms. Douglas to vile and incessant racial discrimination from the outset of her employment.

47.     RCYC began treating Ms. Douglas less favorably than non-black/Jamaican employees while she was still an applicant.  For example, the Company required all prospective employees to take a 50-question "assessment test."  Ms. Douglas scored a 100%.  Ms. Douglas was the only applicant to achieve a perfect score.  Still, Fredericks required Ms. Douglas to go through two interviews while other non-black/Jamaican candidates only had to go through one.

48.     Ms. Douglas did not understand why Fredericks was making her do this because Fredricks was the one who lured Ms. Douglas to the Company, telling her that with her skills, and with her qualifications, she would make $150,000 a year.

---

[3] A voyage aboard *Evrima* costs about $5,600 per person, for a 7-day Mediterranean cruise.

49.     From this point on, Ms. Douglas knew she would have to go above and beyond to show she was just as capable as her coworkers.  Ms. Douglas purchased special outfits, so as to appear more "ritzy," "ultra-luxurious," and to the sensibilities RCYC was after.

50.     On at least three separate occasions, Fredericks asked Ms. Douglas if she "lived in the ghetto," or said things like, "You don't own a house," humiliating Ms. Douglas in front of coworkers.  Each time, Ms. Douglas reminded Fredericks, "No, David, I do not live in the ghetto." Ms. Douglas felt compelled to explain she was an educated woman, her parents provided for her, and that she attended private school as a child.  Nonetheless, Fredericks insisted on discriminating against Ms. Douglas throughout her employment evincing malice and disdain for Ms. Douglas because of her race and national origin.

51.     Fredericks enforced Defendants' policy differently to Ms. Douglas than non-black/Jamaican employees.   Once she was hired—after passing two interviews—Fredericks announced Ms. Douglas' assessment test score in front of the entire Miami office, which was a violation of Company policy.   Indeed, RCYC *never* revealed the scores of its employees. Fredericks did it because he was compelled to justify hiring Ms. Douglas—because of her race.

52.     Ms. Douglas made a point to be friendly with all of RCYC's existing sales agents. One of those was Ms. Mari Navarro ("Navarro"), who had been with the Company since 2018.   In or around early of September, 2019, Ms. Douglas passed by Navarro's desk and noticed her significant leads, and commented that Navarro could make a lot of money if she contacted all of them.

53.     On or about September 11, 2019 Fredericks summoned Ms. Douglas and Ms. Milian to the conference room.  The moment Fredericks saw Ms. Douglas, he said, "What did you tell Mari?"  Ms. Douglas was confused.  "Bianca," Fredericks said, "you're here to do your job—

keep your mind out of other people's business."  He said, "Don't you ever speak to her or bother her ever again!"

54.     Fredericks reduced Ms. Douglas to tears.  She was hurt and could not understand why Fredericks insisted on treating her differently.  It did not take her long to figure out he treated her that way was because of who she was; what she looked like; where she was from; what she spoke like.

55.     Ms. Milian approached Ms. Douglas to console her—a position Ms. Milian undertook throughout the course of Ms. Douglas's employment, helping her navigate an increasingly hostile work environment.  Ms. Milian urged Ms. Douglas to stop crying.  She told Ms. Douglas that Fredericks' behavior was unquestionably inappropriate.  Ms. Milian told Ms. Douglas never to let anyone treat her that way because she did not deserve it.

56.     In or around January of 2020, Ms. Douglas was speaking with Mr. Martinez when Navarro approached Douglas and said, "I have a deck of cards, and I know how to play them." Navarro was referring to her connection to Fredericks and Mr. Douglas Prothero ("Prothero"), the "Chief Executive Officer and Founder" of the RCYC.

57.     Ms. Douglas knew the right thing to do was report Navarro to H.R.  So, she did— or at least she tried.  Ms. Cynthea Bermudez ("Bermudez"), RCYC's "Human Resources Manager," then "Human Resources Specialist," told Ms. Douglas the H.R. department had "no authority to discipline Navarro because she's friends with [Prothero]."

58.     Indeed, Prothero went to great lengths to protect Navarro.  For instance, in or around early December of 2019, RCYC investigated Navarro for mishandling client accounts. Navarro was so embarrassed by her conduct—which unquestionably violated Company policy—

that she Navarro resigned.  However, weeks later, at the direction of Prothero, the Company reinstated Navarro's employment.

59.     Upon Navarro's return, Fredricks and Ms. Milian met with Navarro and clearly address the violations and advised her she is starting from scratch with her database.  She was not entitled to her past guests/data base anymore unless the guest send in an email requesting to work with her.

60.     Defendant treated Ms. Douglas less favorably than Navarro even though Ms. Douglas outperformed Navarro month in and month out.  Where Navarro would have around 15 or 18 bookings per months, Ms. Douglas would have 25-30 … consistently.   In or around late January of 2020, shortly after Defendant reinstated Navarro, Ms. Douglas overheard Navarro complaining to Fredericks that Ms. Douglas was "too loud."

61.     In or around early February of 2020, Fredericks led a Reservations Department meeting concerning dissatisfactory sales figures.  Ms. Douglas was encouraged during the meeting, and afterwards approached Fredericks about what she could do to help.  Fredericks was disgusted she would even suggest there was anything she could do to help. He said, "Bianca, you don't know me like that."  Yet, during that same meeting, Fredericks would praise Navarro when she asked a question or made a comment.  For instance, Fredericks would smile and say, "Thank you for your feedback, Mari."

62.     Around this time, Ms. Milian and Mr. Martinez would approach Ms. Douglas, telling her things like "they want you out."   To that end, Ms. Milian told Ms. Douglas that if she worked with perfection, if she showed Defendant, she was a top performer, RCYC could never fire her … at least for any legitimate reason.

63.     Ms. Douglas became RCYC's top salesperson soon thereafter, a position she held through about November 12, 2020—the day Defendants terminated her.

**RCYC Discriminate against Martinez and Milian for Supporting Douglas**

64.     When Navarro resigned in December of 2019, RCYC told Mr. Martinez that Navarro had forfeited her bookings and promised Mr. Martinez he would inherit Navarro's accounts—which represented about $1.2 million in bookings.  RCYC also told Mr. Martinez Navarro could not contact her past guests and they were now Mr. Martinez's.

65.     Once Navarro returned, however, her first order of business was contacting her former clients—the ones RCYC told Mr. Martinez were his.  Navarro's contentious, threatening misconduct is not only a violation of RCYC's policy, the proviso of her reinstatement, but also of industry practice.

66.     When Ms. Milian asked Navarro questions why she was sending the requests in such large amounts, she Navarro was upset even though she understood the proviso of her reinstatement.  So, Navarro began emailing Fredericks and Insuasti without Ms. Milian's permission.  In turn,  Fredericks approved all of the list of guests to be change back to Navarro.

67.     In or around mid-January of 2020, Navarro threatened Mr. Martinez over his right of his clients' accounts.  Navarro said, "I've been here since the beginning, and I'm friends with the CEO [Prothero]."

68.     Throughout the Spring of 2020, Mr. Martinez kept a close eye on his bookings, and noticed them dwindle by the day.  In or around late March of 2020—around another *Evrima* delay—RCYC took Mr. Martinez's bookings gave them to Navarro without explanation.

69.     This was the beginning of a pattern of RCYC using client accounts and sales leads as leverage to threaten employees it wanted to discipline or retaliate against.  Indeed, RCYC

transferred Mr. Martinez's client accounts on or about November 24, 2020, the day Martinez began medical leave.

70.     Meanwhile, in or around early February of 2020, Mr. Carlos Insuasti ("Insuasti"), the-then "Quality Assurance, Training & Sales Support Leader," told Mr. Jean St. Hubert ("St. Hubert"), a sales agent, that he cannot wait for Ms. Milian to be fired.

71.     After yet another *Evrima* production setback, the Company found itself in a familiar bind.  After second and third delays, thousands of booked guests reached a boiling point, and demanded refunds.  However, the Company did not allow this to stop the Miami Team from booking.  In fact, the Company's direction was precisely the opposite.  Fredericks instructed Ms. Milian that the monthly sales goals needed to be higher.  This meant the Miami Team had, on the one hand, to make more "contacts" with leads, and booking reservations with new clients at a greater level, and on the other, intense customer services talking down angry guests.  This was a Sisyphean task of the highest order.

72.     The Company was now pointing fingers not at the Miami Team's output, but rather at a more immutable characteristic: their linguistic characteristics based on their national origin.

73.     *Evrima*'s March delay caused Ms. Milian great stress and anxiety because she was monitoring the thousands of guests calls amid the March delay.  Ms. Milian was facing additional pressure from the Company to keep numbers up, without regard to the fact that the Company did not have a sailing ship, and the guests who the Miami Team managed to book were furious that their trips were continually delayed or canceled second and third times.

74.     On or about April 30, 2020, Ms. Milian emailed Bermudez in H.R. that she was having severe chest pains, and that her nervous system was affecting her diabetes.  Ms. Milian said

she screams and cries and feels so much pressure because of the sales expectations. Additionally, Ms. Milian complained that she always had to be mindful of the schemes by Navarro and Insuasti.

75.     In or around June of 2020, Mr. Emmanuel Duchatellier ("Duchatellier") told Ms. Milian he emailed Fredericks explaining that Insuasti was spreading rumors that Ms. Milian was going to lose her job, which Insuasti admitted as true.

76.     On or about July 28, 2020, Ms. Milian emailed Bermudez to schedule a meeting to discuss the lack of respect from Navarro and Insuasti. Ms. Milian explained her health was further declining as a result of the stress from management. She explained that she has been nervous at work, her stomach was upsetting her and her blood sugar was skyrocketing.

77.     Ms. Milian feared for her career and her health. However, Bermudez ensured Ms. Milian that her job was not in jeopardy. Bermudez explained that the Miami Team "loved" her as their motivator and leader.

78.     Yet, on or about August 18, 2020 Defendant changed Ms. Milian to Team Leader of the Defendant's U.S. sales—an extreme downgrade from her prior worldwide responsibilities, slashing her pay by thousands of dollars.

**The Malta Regime and RCYC's Scheme to Whitewash Linguistic Characteristics**

79.     By the Summer of 2020, Prothero, Carson and Fredericks believed the Miami Team was not "ritzy" enough for its brand. Plaintiffs and their coworkers did not speak with the dialect the Company envisioned its "Yacht Vacation Consultants" to speak like. The Company constantly instructed non-white European employees to change their accents to comport with the "refined" and "luxurious," like the employees in the Malta office.

80.     Consequently, the Company hired Mr. Richard Carson as its "Director of Global Sales," to head the Malta location, and replace Fredericks as the "Director of Sales."  Carson held direct supervisory authority over Plaintiffs and all employees on the Miami Team.

81.     Carson began directing Fredericks and Salazar to make changes regarding the way the Miami Team sounded on the calls.

82.     For example, on or about July 20, 2020, Fredericks told Ms. Douglas, "I know you mean well, but you need to change your speech on the calls."  Fredericks said, "it's not '*wit* you,' it's '*with* you.'"  Fredericks and the Company did not see Ms. Douglas as the number 2 sales agent at the Company, or their employee who had $3.5 million in booking revenue.  Indeed, for the year-to-date booking revenue of 2020, Ms. Douglas was number 2 out of 12 Yacht Vacation Consultants, bringing in $3.5 million in sales revenue.  That was not satisfactory for Fredericks or Defendant—her dialect was still a problem.

83.     Salazar called Ms. Douglas sometime in September, and said, "I don't want you to worry about your job—you're doing well here.  I don't want you to be worried."  Ms. Douglas said,  "My parents came from Jamaica they worked hard."

84.     On or about September 9, 2020, Prothero and Carson held a meeting with the Miami Team.  The Company announced it was relocating its management offices to Malta.  Defendant RCYC initiated the Malta regime by promoting three white, European agents even though these individuals had no cruise reservations or sales backgrounds and certainly did not have the bookings to justify their promotion.  In contrast, Ms. Douglas and Mr. Martinez had millions of dollars of sales for RCYC—under the supervision and leadership of Ms. Milian.

85.     Plaintiffs were extremely offended they did not even have the opportunity for such promotion.   Instead, RCYC hired employees who would not question Defendant's unlawful discriminatory practices.

86.     Several days later, in or around mid-September of 2020, Carson had a meeting with the Miami Team.   Carson explained he and the Company were unhappy with how the agents sounded on the calls.   Carson insisted that Mr. Martinez and Ms. Douglas needed to change their dialect on all sales calls.

87.     During daily meetings, Salazar and Fredericks implored Ms. Milian that the Miami Team that each agent needed to sound more "refined," "upscale," and "ritzy."  Defendant required the Miami Team to sound *more* "British," and conform to "European" sensibilities.  Consequently, the Company implored Mr. Martinez, Ms. Douglas and their coworkers to whitewash any and all immutable cultural characteristics of a diverse Miami Team.

88.     As an industry practice, Ms. Milian had provided the Miami Team with a script for speaking to its potential clients.   The original script was tailored for a diverse Miami Team, allowing each agent to rely on their personality, and disadvantaged no employee for being who they are—racially, ethically, or their national origin.

89.     So, the Company announced the "New Global Excellence Outbound Script 2020."

**<u>Salazar, Carson, and RCYC Retaliate Against Martinez</u>**

90.     Mr. Martinez approached Carson about what the Company was looking for with the script.   On its face, the script was the script and did not tell the employees to "sound British."  However, the script was double the length of the original, and included words and phrases Mr. Martinez never used.   Carson played Mr. Martinez a recorded call from a European agent named Glen Stacey from the Malta office.   While Glen sounded professional, he spoke with a diction and

15

dialect Mr. Martinez was incapable of.  Mr. Martinez said, "I'm an immigrant.  I have an accent.
That will never change no matter how hard I try."

91.     Carson then instructed Ms. Milian to email the recording of Glen to the rest of the
Miami Team.

92.     Shortly thereafter Salazar told Ms. Milian that he was upset that Mr. Martinez
opposed Carson's directive.  Salazar told Ms. Milian that Mr. Martinez needed to do as Salazar
and Prothero instructed them to do.

93.     Mr. Martinez was confused when Ms. Milian told him such because RCYC
*encouraged* Mr. Martinez and the Miami Team to provide their feedback.  However, when it came
to discriminatory objections, the Company made clear it was not interested in such complaints.
and express their opposition to the "ritzy" language protocol.

94.     Mr. Martinez was perplexed.  Mr. Martinez was particularly concerned with his
status as a Hispanic immigrant and the dichotomy between the script and his background as a man
of Venezuelan national origin.  Mr. Martinez's dialect was the same as the day RCYC hired him.
To be clear, Mr. Martinez's dialect, his nation of origin, his race—or an immutable characteristic—
had absolutely zero effect on his performance.  In fact, his sales were better than ever before … at
the height of the uncertainty from the COVID-19.

95.     In or around early September of 2020, Mr. Martinez complained to Berman and
Composto about the discriminatory hostile work environment he was subjected to.

96.     On or about September 9, 2020, Mr. Martinez asked Salazar if he would like to do
a coffee-chat—something that RCYC's  management did with its Vacation Yacht Consultants on
a monthly basis.

97.     Initially, Mr. Martinez suggested taking a 15-minute walk with Salazar to discuss Mr. Martinez's qualms with the Malta regime and Mr. Prothero's decisions and vision for the Miami Team.  However, Mr. Martinez's "Coffee Chat" with Salazar turned into a two-hour escapade that was far more than Mr. Martinez bargained for.

98.     Mr. Martinez and Salazar walked through Midtown Miami and stumbled upon a bar.  Salazar asked Mr. Martinez if he would like to have a drink.  Mr. Martinez was hesitant. He was not a drinker and in fact had spent time recovering from pain-killer medications stemming from a back injury.  Nonetheless, in the interest of indulging Salazar—solely for business purposes—Mr. Martinez obliged.

99.     After Mr. Martinez had a beer, however, Salazar pushed Mr. Martinez to drink more.  "C'mon," Salazar said, "a drink and how about we share a dish?" Mr. Martinez declined. Salazar then began explaining that he and his wife were having marital issues.  He explained that they were not interested in having children and that they were a "very independent couple."  Then Salazar looked at Martinez and said, "How old are you?"  Mr. Martinez was very uncomfortable. Mr. Martinez said he was 42 years old.  Salazar told him he was in his thirties, and he was "basically the same age" as Mr. Martinez.  It became evident to Mr. Martinez that Salazar was making an unwanted sexual advance.  In turn, however, Salazar picked up on Mr. Martinez's discomfort and the conversation then turned to the subject at issue: Mr. Martinez's extreme displeasure in Carson's direction for Mr. Martinez to change his natural dialect.  Salazar told Mr. Martinez simply to give the new changes a "chance."  Salazar then said, "There are a lot of things in the works that I wish I could tell you."

100.     After the two left the bar, Salazar turned to Mr. Martinez and said, "Are you with anybody?  A man or a woman?"  Mr. Martinez was stunned.  His sexual orientation was never an

issue.  However, Salazar stared at Martinez, waiting for a response.  Mr. Martinez felt pressured to say he was a gay man.  Afterwards, the two went their separate ways.

101.    Mr. Martinez contacted Ms. Milian immediately to report that Salazar had questioned Mr. Martinez's sexuality.  He explained that he was extremely uncomfortable.

102.    Mr. Martinez did not feel safe at work.  He was scared.  He felt targeted by management.  Consequently, he was experiencing extreme weight loss, losing 40 pounds, and having extreme anxiety and depression.  Mr. Martinez was seeking psychiatric treatment throughout the Summer of 2020 because of the hostile work environment he was enduring.

103.    On or about September 16, 2020, Mr. Martinez complained to Berman.

### Milian Arranges Meeting to Support the Miami Team's Discriminatory Complaints

104.    Ms. Milian approached Ms. Angela Composto ("Composto"), RCYC's "Sr. VP of Sales and Marketing," and explained Plaintiffs and the Miami Team were offended by the Company's directive for the agents to change their dialect.

105.    Ms. Milian approached Composto because she supported her team's opposition to the script and the new practices implanted by the Malta location.

106.    On or about September 18, 2020, Composto held a video conference with the Miami Team to discuss the agents' discriminatory objections to the Company's employment practices.   The agents were upset that the script did not allow them to be who they were.

107.     Defendant was asking them to do the impossible: change their voice, their dialects, their races, the countries they were from.  For example, Duchatellier said, "I feel we're not luxury because we don't have the British language."

108.    Ms. Douglas said, "I will never sound British over the phone.  I will do my very best to pronounce my words.  I will say 'with you,' not 'wit you.'  I will do my best to talk properly.

But I'll tell you this: I'm a salesperson and I'll get a sale … that's what I know how to do." Ms. Douglas further complained about the managers in Malta. She said, "If there's no people like me [in Malta] then they're not gonna understand me, and I'm not gonna fit in … and I never want to be put in that position because of the color of my skin or how I was born."

109.    Mr. Martinez complained that Carson and the Malta office are not considering the Miami Team's diversity. He said, "[Carson] doesn't understand our language … we need somebody here in Miami that's a leader that understands our language." Mr. Martinez also complained that Ms. Milian should have been included in creating the new script because she understands the cultural diversity of the Miami Team—not to mention 30 years of cruise industry experience.

110.    Similarly, Mr. Yonder Sanchez ("Sanchez") stated, "I'm missing a lot of opportunities myself because I can't send emails in Spanish … I've had a lot of Mexico leads, Argentina leads, a lot of leads in Ecuador and they want something in Spanish, but the Company has a strict rule of English only. I've asked, and the Company says no. And I lose a lot of connections that way."

111.    Meanwhile, Navarro lit a cigar about an hour into the meeting, after spending the better part of that time before scoffing at her co-worker's discrimination complaints. Defendant did not, in any manner, discipline Navarro for smoking a cigar, at work, during a company meeting.

**Defendant Retaliates Against Plaintiffs for Complaining about Discrimination**

112.    The Company was furious that Plaintiffs and the Miami Team contended that the script was discriminatory. For example, Mr. JP Salazar ("Salazar"), the then-"Chief of Staff" approached Milian after the meeting and said, "It's not acceptable for your agents to express themselves and their concerns in a meeting with [Composto]." said, "The fact that your agents

expressed themselves shows you have zero control over this team."  Ms. Milian was stunned. "People have to do what they are told," Salazar said, "no questions asked."

113.    This directive from Salazar comports with the Company's repeated instructions to Plaintiffs to stay away from H.R. entirely and not report any harassment or discrimination.

114.    On or about September 29, 2020, Insuasti reprimanded Mr. Martinez for complaining about discrimination.

115.    On or about September 30, 2020, Carson placed Ms. Milian on a development action plan—for the first time.  Ms. Milian asked Carson why she was being placed on the development plan.  Carson told her that *every* management member was receiving one, not just Ms. Milian.  However, Carson did not place Insuasti on a development plan.

116.    However, before the meeting, Carson always told Ms. Milian he very much appreciated her work ethic and ensured her she did not have to worry about losing her job. When Ms. Milian always asked him for feedback via email or their one-on-one meetings, Carson would always say something simple like, "Job well done," and leave it at that.

117.    It was not until after Ms. Milian arranged the September 18, 2020 meeting that Carson reprimanded Ms. Milian, placing her on a developmental action plan.

118.    Soon thereafter, in or around the end of October of 2020, Carson removed Mr. Martinez from RCYC's team meetings.  Mr. Martinez's supervisors told him that Carson does not like to have any questions or concerns regarding the Company's decision-making—even if such concerns are those pertinent to discrimination.

119.    As a result of Mr. Martinez's opposition, Carson removed Mr. Martinez from sales and told him to focus on service.  Mr. Martinez was flabbergasted.  He was a Yacht Vacation

Consultant.  He could not earn a commission working for sales.  Carson removed Mr. Martinez's job position, and stripping him of his ability to earn money—because of his dialect.

120.    Mr. Martinez asked Carson if he had permission to book a client who was set to book a vacation—for upwards of $10,000.  Carson told Mr. Martinez he would have to tell the guest to call back.  Mr. Martinez was stunned.  This contradicted RCYC's incessant emphasis on "lead tracking" and turnaround time to follow up on client inquiries.

121.    Meanwhile, on or about September 24, 2020 Insuasti retaliated against Mr. Martinez by taking away his leads and giving them to favorable agents like Navarro. Consequently, Mr. Martinez's sales diminished to nothing.  Further, Insuasti told Mr. Martinez he needed to dress better, yet Navarro dressed extremely unprofessional.   Mr. Martinez then complained to H.R. regarding Insuasti' s retaliation.

122.    Defendant's incessant demands of the "Global Excellence" script and the blatant discrimination perpetrated by Prothero, Carson, and the Malta regime took a toll on Mr. Martinez's well-being.

123.    Indeed, around September of 2020, Mr. Martinez's anxiety and depression became more severe by the day.  He began losing weight and struggled sleeping.

124.    Mr. Martinez began psychiatric treatment, and was diagnosed with anxiety and depression.

### Defendant Terminates Douglas because She Complained about Discrimination

125.    Sometime in mid-October of 2020 Douglas emailed Ms. Bermudez concerned about her employment.   Ms. Bermudez said, "Your job is not in jeopardy."   However, Ms. Bermudez expressly told Ms. Douglas not to complain anymore.  Ms. Bermudez said, "But don't talk in the meetings.  Give the feedback to Frances directly."

126.    On or about October 22, 2020, Carson instructed Ms. Milian to reprimand Ms. Douglas for allegedly making a Ms. Alison Davie ("Davie") cry at work.  After conferring with Ms. Milian, Ms. Douglas had no idea of what incident Carson was referring.  To be sure, Ms. Milian even asked Davie whether Ms. Douglas made her cry and Davie said she had no idea what was happening.  Finally, Ms. Douglas then conferred with Berman, Composto, and Ms. Milian who agreed that there was no indication this event ever happened.  Still, Carson insisted that Ms. Milian reprimand Ms. Douglas even after Ms. Milian told Carson nothing even happened.

127.    Later that day, Ms. Douglas went to H.R. to complain about be singled out and raising her concerns about RCYC's discriminatory practices.

128.    On or about October 27, 2020, Carson emailed the Reservations Department explaining that the team had to be smarter with their time, and needed to "strive for excellence," referring in part, to the Malta offices authority over the Miami Team.  Carson said that agents were no longer allowed to express their concerns during team meetings.

129.    Around this time, Prothero said, "It's time to clean house."

130.    On or about November 12, 2020, Defendant terminated Ms. Douglas's employment.

131.    Ms. Douglas attempted to logged in to the virtual morning lineup meeting. However, Mr. Duchatellier called Ms. Douglas and said, "I don't think you work here anymore because you're not in the meeting."  Ten minutes later, Douglas was kicked out of the meeting.

132.    Ms. Douglas called Ms. Bermudez, in tears.  She explained that her termination was discriminatory.   Ms. Douglas said, "You promised I wouldn't be retaliated against."   Ms. Bermudez said, "I'm so sorry Bianca."

133.    Ms. Douglas explained that no one had higher sales figures than her, and that she had just made a booking on her day off.  Ms. Douglas showed Ms. Bermudez a screenshot of Navarro smoking a cigar in the meeting.  There was nothing Ms. Douglas could do.

134.    Carson e-mailed Ms. Douglas explaining, "[a]s the downturn in business has continued and the Bonvoy deployment delayed, the Company now needs to downsize the Reservations department.  Consequently, the company has decided to eliminate your position and your last day of employment will be today."  However, these reasons were engineered as a pretext for an unlawful termination because of Plaintiffs' race, national origin, and their objection to discriminatory practices.

135.    Defendant terminated Ms. Douglas because of her race and national origin, and because she complained about discriminatory practices based on her race and national origin.

136.    Carson's email was engineered as a pretext to terminate Ms. Douglas under the guise of a lawful termination.  Indeed, the Company was seeking to expand their Reservations Department in the Fall of 2020.  On or about September 23, 2020, Carson emailed Navarro stating, "You would also see on the career service section of the website new [Yacht Vacation Consultant] positions advertised for our growth expansion."   This comports with the hiring of new agents before the Company terminated Ms. Douglas's employment, and the job postings for additional Yacht Vacation Consultants *after* the Company terminated Ms. Douglas.

137.    To be sure, Ms. Douglas had $345,897 in bookings revenue for October of 2020—the most on the Miami team.  Conversely, Navarro had $234,498 in bookings revenue, yet Defendant did not terminate Navarro.  Moreover, Navarro did not complain about discrimination. Yet, the Company had investigated Navarro's mishandling of client funds, she resigned, she took

leads from other agents, and agreed with the Company that the agents complaining about discrimination needed to stop complaining.

138.    Defendant's reasoning for terminating Ms. Douglas's employment has changed since her termination.  Indeed, during the agency phase of this case, Defendant contended COVID-19 was the reason for Ms. Douglas's termination.  This reason is not stated in Carson's termination e-mail.  Later, RCYC claimed the Company terminated Ms. Douglas due to a negative mystery shopper call.

139.    Different still, Carson told Ms. Douglas that, "Because of your relationship with the company, the company is willing to provide you with a positive reference."

140.    Composto called Martinez after Douglas's termination crying.   Afterwards, Composto called Douglas directly.  She told Douglas she was fired because she was black.

141.    At bottom, the Company terminated Ms. Douglas because of her race and national origin, and because she complained about race and national origin discrimination.

### Defendant Terminates Milian for Supporting Douglas and Martinez's Opposition to RCYC's Discriminatory Practices

142.    On or about October 28, 2020, Ms. Milian emailed Carson complaining that she was working in a hostile work environment.  Ms. Milian explained that Insuasti "makes me feel very uncomfortable, harassed and he is hostile whenever he communicates with me."  Ms. Milian then forwarded the email to Bermudez and requested a discussion with Bermudez and Carson.

143.    On or about October 30, 2020, Navarro called Mr. Fidel Gonzalez ("Gonzalez"), a sales agent and left an angry message undermining Ms. Milian, saying, "She can't lead for shit," "she doesn't know how to do her job," and, "I hate that bitch."  Navarro also told Gonzalez that she believed Ms. Milian was trying to get the team to go against her.  However, Gonzalez did not believe that to be true at all.

144.    On or about November 12, 2020, Defendant RCYC terminated Ms. Milian's employment.

145.    Carson and Bermudez called Ms. Milian and stated that she was being fired because of COVID-19, and that November 12, 2020 would be her last day.[4]

### RCYC Retaliates against Martinez for Taking Medical Leave and Complaining about Discrimination and Hostile Work Environment to H.R.

146.    On or about November 6, 2020, Mr. Martinez informed his psychiatrist, Dr. Hung Nguyen ("**Dr. Nguyen**") of all the stress and anxiety he was placed under as a result of Defendant's discrimination.  Mr. Martinez said, "I feel like I've had panic attacks, [an] incredible hard time concentrating, and my depression continues."  Dr. Nguyen responded, "I recommend you consider vacating a toxic environment that you do not see will change."

147.    The Company did not terminate Mr. Martinez's employment on November 12, 2020 because Mr. Martinez requested a meeting with Composto and Berman to complain about Salazar and the hostile work environment he was still experiencing throughout the Summer and Fall of 2020.  After their meeting, Mr. Martinez sent a detailed e-mail outlining his experienced with Salazar, objections to Carson's directives, and that the Company stripped his leads and clients.

148.    Mr. Martinez wrote, "I do not feel safe ate work right now.  I feel sacred, uneasy and targeted.  This has caused tremendous physical, emotional pain and income loss for me.  I have had extreme anxiety and depression even panic attacks.  I have lost close to 40 pounds with this process.  I left Silversea Cruises, a great company, for a career."

149.    On or about November 22, 2020, Dr. Nguyen filled out the necessary documentation for Mr. Martinez to take FMLA.  Dr. Nguyen stated Mr. Martinez's stress, anxiety and depression began on or around August 1, 2020.  Dr. Nguyen's report stated that Mr. Martinez

---

[4] The Company also terminated outspoken agents on November 12, 2020 including Mr. Duchatellier.

had been and would continue to be incapacitated to work from November 17, 2020 through February 9, 2021. Dr. Nguyen also stated that Mr. Martinez would undergo psychotherapy sessions bi-monthly, beginning on or about December 1, 2020.

150. On or about November 24, 2020, Bermudez emailed Mr. Martinez to inform him that the Company had approved his FMLA leave through February 9, 2021. However, Mr. Martinez and Bermudez discussed that Mr. Martinez did not intend to take the entire 12 weeks unless he was medically unfit to work.

151. Later that afternoon, however, on or about November 24, 2020, Mr. Martinez emailed Berman and Bermudez to inform human resources that his clients have been texting and calling him stating that Defendant has told multiple guests that Mr. Martinez no longer works for the Company. Later that day, Bermudez acknowledged receipt of the email. On or about November 25, 2020, Mr. Martinez sent another email indicating that another guest reached out to him and stated that the Company said he was no longer employed by RCYC.

152. On or about December 1, 2020, Berman finally emailed Mr. Martinez denying that anyone from the Company told his clients that he was terminated. Yet, clients continued notifying Mr. Martinez that they received information that Mr. Martinez was no longer their agent because he was no longer employed.

153. Mr. Martinez had experienced this before. RCYC would transfer his leads to Navarro or give her his client accounts in the same way they transferred leads or client accounts to agents the Company favored.

154. On or about February 10, 2021, Martinez explained to Bermudez that he simply could not take working for Defendant any longer. Mr. Martinez resigned, writing, "I have experienced frequent and repeated harassment, discrimination and retaliation … [t]herefore, this

has become an extremely toxic work environment [which] I can no longer subject myself to."  Mr. Martinez further explained, "[t]he situation became so severe I had to go on FMLA … I have no other choice but [to] resign [from] my position."

155.    H.R. insisted on refusing to investigate any of the matters Mr. Martinez complained about.  He had complained about hostility from every level of the Company, from his supervisor, to Carson, to H.R., but to no avail.

156.    Defendant RCYC constructively discharged Mr. Martinez.

157.    Mr. Martinez made this decision in conjunction with Dr. Nguyen who advised Mr. Martinez that working for Defendant RCYC was affecting his health in a serious manner.  To be sure, any reasonable employee would be compelled to resign if their doctor informed them working for the employer in a toxic work environment was having serious effects on their health.

158.    In or around early March of 2021, RCYC's insurance company informed Mr. Martinez it had concluded, based on medical evaluations, that Defendant Ritz-Carlton Yachts caused Mr. Martinez's depression, anxiety and emotional distress as a result of subjecting him to ongoing and relentless discrimination and retaliation.

159.    Defendants unlawfully discriminated against Plaintiffs because of their race and national origin and because they complained and opposed discrimination and retaliation.

160.    Plaintiffs claim aggravation, activation, and/or exacerbation of any preexisting conditions.

161.    As a result of Defendants' unlawful conduct, Plaintiffs have suffered damages, including but not limited to financial and economic damages, lost wages (back pay and front pay) and benefits, advancement opportunities with Defendant, and continues to suffer the same.

162.    Plaintiffs have also suffered—and have records of suffering—emotional distress, mental anguish, loss of personal dignity, and other intangible damages.

163.    Plaintiffs also seek punitive damages against Defendants because of their implantation of blatant discriminatory practices with malice or with reckless indifference to Plaintiffs' civil rights under federal and state law.

164.    At bottom, Defendants are liable for depriving Plaintiffs of their right to pursue an equal employment opportunity in a work environment free from relentless discrimination, harassment and retaliation.

## CAUSES OF ACTION

### COUNT I
### Title VII, 42 U.S.C. § 2000e-3(a)
### Retaliation
### (Plaintiffs against Defendant RCYC)

165.    Plaintiffs reincorporate the allegations in paragraphs 74-132.

166.    Defendant RCYC violated Title VII's anti-retaliation provision by taking materially adverse actions against Plaintiffs because Plaintiffs engaged in protected activity.

167.    Plaintiff Douglas and Martinez engaged in protected activity by opposing Defendant RCYC's employment practices which Plaintiff Milian supported.

168.    Plaintiff Milian engaged in protected activity on or about September 18, 2020 by approaching Composto and explaining that her team was offended by the Company's directive for the Plaintiff Douglas and Plaintiff Martinez to change their dialects.  Plaintiff Milian engaged in further protected activity on or about October 28, 2020 when she complained to Carson and Bermudez about a hostile work environment.

169.    Plaintiff Milian suffered materially adverse actions because of her protected activity.  Indeed, immediately after the September 18, 2020 meeting, Salazar told Milian, "It's not

acceptable for your agents to express themselves and their concerns in a meeting with [Composto]."  Salazar reprimanded Milian, saying, "The fact that your agents expressed themselves shows you have zero control over this team."  Salazar made clear the Company would not tolerate discrimination complaints.  Salazar said, "People have to do what they are told—no questions asked."  Then, or about September 30, 2020, Carson placed Milian on a development action plan for the first time.  Ultimately, on or about November 12, 2020, Carson and Bermudez terminated Plaintiff's employment on behalf of Defendant RCYC.

170.    Any reasonable worker well might be dissuaded about opposing and/or supporting a charge of discrimination if she knew her supervisors would place her on a developmental plan; reprimand her for creating a platform for her subordinates to complain; and certainly, if she knew her employer would terminate her employment for opposing and/or supporting a charge of discrimination.

171.    Plaintiff Milian's protected activity and the subsequent materially adverse actions described above are causally connected based on temporal proximity, and because the protected activity and adverse actions are not wholly unrelated.

172.     Indeed, the reprimands by Salazar and Carson are causally connected because the discipline would not have occurred but for Plaintiff Milian's protected activity.  To be sure, both Salazar and Carson were aware that Plaintiff Milian supported her agents' discrimination complaints and that she organized the meeting with Composto.

173.    Plaintiff Douglas engaged in protected activity by opposing the Company's directive to "sound British" during her sales calls.  On or about September 18, 2020 during the meeting held by Composto, Plaintiff Douglas said, "I will never sound British over the phone.  I will do my very best to pronounce my words.  I will say '*with* you,' not '*wit* you.'  I will do my

best to talk properly. But I'll tell you this: I'm a salesperson and I'll get a sale … that's what I know how to do."

174.    Plaintiff Douglas further complained about the promotion of three white, European agents over herself.  Plaintiff Douglas said, "If there's no people like me [in Malta] then they're not gonna understand me, and I'm not gonna fit in … and I never want to be put in that position because of the color of my skin or how I was born."

175.    Plaintiff Douglas suffered materially adverse actions as a direct result of the above-described protected activity.  First, Bermudez told Douglas she was no longer permitted to complain to Company executives.  Bermudez said, "Don't talk in the meetings.  Give the feedback to Frances directly."  Second, on or about October 22, 2020, Carson orchestrated a scheme to reprimand Plaintiff Douglas for a legitimate reason.  Carson insisted that Milian reprimand Plaintiff Douglas for allegedly making Davie cry at work—an event Davie herself admitted never happened.  Third, on or about October 27, 2020, Carson implored Plaintiff Douglas and the Miami Team to "be smarter with [their] time," and "strive for excellence," and that the agents no longer were allowed to express their concerns during team meetings.  Finally, on or about November 12, 2020, Defendant RCYC terminated Plaintiff Douglas's employment.

176.    Any reasonable worker might well have been dissuaded from complaining about discrimination if she knew her employer would strip her sales leads; tell her she was not allowed to complain about discrimination; that management would begin concocting schemes to falsely reprimand her; and if she knew her employer would terminate her employment because she complained about discrimination.

177.    Plaintiff Douglas's materially adverse actions are causally connected to her protected activity.   Indeed, a causal connection exists between her protected activity and

subsequent actions based on temporal proximity, and because the discrimination complaints and adverse actions are not wholly unrelated.

178.     In or around late September of 2020, Bermudez told Plaintiff Douglas not to "talk in the meetings" after Bermudez learned Douglas had complained about discrimination during the September 18, 2020 meeting.  Similarly, Salazar and Carson both commanded Douglas not to complain in the meetings.  Carson instructed Milian to reprimand Plaintiff Douglas because of her complaints.  Carson stripped Plaintiff Douglas's leads because she opposed RCYC's practices which she reasonably believed were discriminatory.  Finally, on or about November 12, 2020, Defendant RCYC terminated Plaintiff Douglas's employment because she complained about discrimination.  Thus, Plaintiff Douglas can establish a causal nexus.

179.     Plaintiff Martinez engaged in protected activity when he told Carson he would never sound like a white European on the phone. "I'm an immigrant," Plaintiff Martinez said.  "I have an accent.  That will never change no matter how hard I try."  On or about September 9, 2020 Mr. Martinez went to have a "Coffee Chat" with Salazar to discuss Martinez's vehement opposition to Carson's directive for Martinez to sound like a white European.  Plaintiff Martinez complained about Carson's discriminatory directive during the September 18, 2020 meeting. Plaintiff Martinez said, "[Carson] doesn't understand our language … we need somebody here in Miami that's a leader that understands our language."  Martinez complained that Milian should have been hired—or at least considered—for the promotion to management over the white, European employees who had no relevant sales experience nor any demonstrative understanding of the diversity of the Miami Team.

180.     Plaintiff Martinez suffered materially adverse actions because he engaged in the above-described protected activity.  Carson removed Mr. Martinez from participating in RCYC's

team meetings.  Carson then removed Martinez from his sales duties completely, and instructed him to focus on customer service.  Indeed, Carson told Martinez that he could not even make a sale if one of his leads was interested.  To be sure, Carson stripped Martinez of his ability to earn commissions because of his discrimination complaints.  Further, Salazar told Ms. Milian that he was upset that Martinez complained to Carson, and that he was no longer to make complaints.

181.   These materially adverse actions are causally connected to Plaintiff Martinez's protected activity.  Defendant RCYC took these actions against Plaintiff Martinez because he engaged in the above-described protected activity.  Similarly, both Carson and Salazar were aware of Plaintiff Martinez's complaints, and initiated these adverse actions immediately following Martinez's complaints.  Plaintiff Martinez's protected activity and subsequent materially adverse actions are not wholly unrelated.  Indeed, these facts give rise to the reasonable inference that Plaintiff Martinez's protected activity and the subsequent materially adverse actions are causally connected.

182.   As a result of Defendant RCYC's unlawful retaliation in violation of Title VII § 200e-3(a), Plaintiffs have suffered damages.

**COUNT II**
**FCRA § 760.10(7)**
**Retaliation**
**(Plaintiffs against Defendant RCYC)**

183.   Plaintiffs reincorporate the allegations in paragraphs 74-133.

184.   Defendant RCYC violated the FCRA's anti-retaliation provision by taking materially adverse actions against Plaintiffs because Plaintiffs engaged in protected activity.

185.   Collectively, Plaintiff Douglas and Martinez engaged in protected activity by opposing Defendant RCYC's employment practices which Plaintiff Milian supported.

186.    Plaintiff Milian engaged in protected activity on or about September 18, 2020 by approaching Composto and explaining her team was offended by the Company's directive for the agents to change their dialects.  Plaintiff Milian engaged in further protected activity on or about October 28, 2020 when she complained to Carson and Bermudez about a hostile work environment.

187.    Plaintiff Milian suffered materially adverse actions because of her protected activity.  Indeed, immediately after the September 18, 2020 meeting, Salazar told Milian, "It's not acceptable for your agents to express themselves and their concerns in a meeting with [Composto]."   Salazar reprimanded Milian, saying, "The fact that your agents expressed themselves shows you have zero control over this team."  Salazar made clear the Company would not tolerate discrimination complaints.  Salazar said, "People have to do what they are told—no questions asked."  Then, or about September 30, 2020, Carson placed Milian on a development action plan for the first time.  Ultimately, on or about November 12, 2020, Carson and Bermudez terminated Plaintiff's employment on behalf of Defendant RCYC.

188.    Any reasonable worker well might be dissuaded about opposing and/or supporting a charge of discrimination if she knew her supervisors would place her on a developmental plan; reprimand her for creating a platform for her subordinates to complain; and certainly if she knew her employer would terminate her employment for opposing and/or supporting a charge of discrimination.

189.    Plaintiff Milian's protected activity and the subsequent materially adverse actions described above are causally connected based on temporal proximity, and because the protected activity and adverse actions are not wholly unrelated.

190.    Indeed, the reprimands by Salazar and Carson are causally connected because the discipline would not have occurred but for Plaintiff Milian's protected activity.  To be sure, both Salazar and Carson were aware that Plaintiff Milian supported her agents' discrimination complaints and that she organized the meeting with Composto.

191.    Plaintiff Douglas engaged in protected activity by opposing the Company's directive to "sound British" during her sales calls.  On or about September 18, 2020 during the meeting held by Composto, Plaintiff Douglas said, "I will never sound British over the phone.  I will do my very best to pronounce my words.  I will say '*with* you,' not '*wit* you.'  I will do my best to talk properly. But I'll tell you this: I'm a salesperson and I'll get a sale … that's what I know how to do."

192.    Plaintiff Douglas further complained about the promotion of three white, European agents of herself.  Plaintiff Douglas said, "If there's no people like me [in Malta] then they're not gonna understand me, and I'm not gonna fit in … and I never want to be put in that position because of the color of my skin or how I was born."

193.    Plaintiff Douglas suffered materially adverse actions as a direct result of the above-described protected activity.  First, Bermudez told Douglas she was no longer permitted to complain to Company executives.  Bermudez said, "Don't talk in the meetings.  Give the feedback to Frances directly."  Second, on or about October 22, 2020, Carson orchestrated a scheme to reprimand Plaintiff Douglas for a legitimate reason.  Carson insisted that Milian reprimand Plaintiff Douglas for allegedly making Davie cry at work—an event Davie herself admitted never happened.  Third, on or about October 27, 2020, Carson implored Plaintiff Douglas and the Miami Team to "be smarter with [their] time," and "Strive for excellence," and that the agents no longer

allowed to express their concerns during team meetings.  Finally, on or about November 12, 2020, Defendant RCYC terminated Plaintiff Douglas's employment.

194.    Any reasonable worker might well have been dissuaded from complaining about discrimination if she knew her employer would strip her sales leads; tell her she was not allowed to complain about discrimination; that management would begin concocting schemes to falsely reprimand her; and if she knew her employer would terminate her employment because she complained about discrimination.

195.    Plaintiff Douglas's materially adverse actions are causally connected to her protected activity.  Indeed, a causal connection exists between her protected activity and subsequent actions based on temporal proximity, and because the discrimination complaints and adverse actions are not wholly unrelated.

196.    In or around late September of 2020, Bermudez told Plaintiff Douglas not to "talk in the meetings" after Bermudez learned Douglas had complained about discrimination during the September 18, 2020 meeting.  Similarly, Salazar and Carson both commanded Douglas not to complain in the meetings.  Carson instructed Milian to reprimand Plaintiff Douglas because of her complaints.  Carson stripped Plaintiff Douglas's leads because she opposed RCYC's practices which she reasonably believed were discriminatory.  Finally, on or about November 12, 2020, Defendant RCYC terminated Plaintiff Douglas's employment because she complained about discrimination.  Thus, Plaintiff Douglas can establish a causal nexus.

197.    Plaintiff Martinez engaged in protected activity when he told Carson he would never sound like a white European on the phone. "I'm an immigrant," Plaintiff Martinez said.  "I have an accent.  That will never change no matter how hard I try."  On or about September 9, 2020 Mr. Martinez went to have a "Coffee Chat" with Salazar to discuss Martinez's vehement

opposition to Carson's directive for Martinez to sound like a white European.  Plaintiff Martinez complained about Carson's discriminatory directive during the September 18, 2020 meeting. Plaintiff Martinez said, "[Carson] doesn't understand our language … we need somebody here in Miami that's a leader that understands our language."  Martinez complained that Milian should have been hired—or at least considered—for the promotion to management over the white, European employees who had no relevant sales experience nor any demonstrative understanding of the diversity of the Miami Team.

198.    Plaintiff Martinez suffered materially adverse actions because he engaged in the above-described protected activity.  Carson removed Mr. Martinez from participating in RCYC's team meetings.  Carson then removed Martinez from his sales duties completely, and instructed him to removed Martinez from sales completely, and commanded him to focus on customer service.  Indeed, Carson told Martinez that he could not even make a sale if one of his leads was interested.  To be sure, Carson stripped Martinez of his ability to earn commissions because of his discrimination complaints.  Further, Salazar told Ms. Milian that he was upset that Martinez complained to Carson, and that he was no longer to make complaints.

199.    These materially adverse actions are causally connected to Plaintiff Martinez's protected activity.  Defendant RCYC took these actions against Plaintiff Martinez because he engaged in the above-described protected activity.  Similarly, both Carson and Salazar were aware of Plaintiff Martinez's complaints, and initiated these adverse actions immediately following Martinez's complaints.  Plaintiff Martinez's protected activity and subsequent materially adverse actions are not wholly unrelated.  Indeed, these facts give rise to the reasonable inference that Plaintiff Martinez's protected activity and the subsequent materially adverse actions are causally connected.

200.    As a result of Defendant's unlawful retaliation in violation of the FCRA, Plaintiffs have suffered damages.

**<u>COUNT III</u>**
**42 U.S.C. § 1981**
**Retaliation**
**(<u>Plaintiffs vs. Defendants RCYC, Carson, Salazar, and Prothero</u>)**

201.    Plaintiffs reincorporate the allegations in paragraphs 74-132.

202.    Defendant RCYC, Carson, and Salazar violated § 1981 by taking materially adverse actions against Plaintiffs because Plaintiffs engaged in protected activity.

203.    Collectively, Plaintiff Douglas and Martinez engaged in protected activity by opposing Defendant RCYC's employment practices which Plaintiff Milian supported.

204.    Plaintiff Milian engaged in protected activity on or about September 18, 2020 by approaching Composto and explaining her team was offended by the Company's directive for the agents to change their dialects.  Plaintiff Milian engaged in further protected activity on or about October 28, 2020 when she complained to Carson and Bermudez about a hostile work environment.

205.    Plaintiff Milian suffered materially adverse actions because of her protected activity.  Indeed, immediately after the September 18, 2020 meeting, Salazar told Milian, "It's not acceptable for your agents to express themselves and their concerns in a meeting with [Composto]."  Salazar reprimanded Milian, saying, "The fact that your agents expressed themselves shows you have zero control over this team."  Salazar made clear the Company would not tolerate discrimination complaints.  Salazar said, "People have to do what they are told—no questions asked."  Then, or about September 30, 2020, Carson placed Milian on a development action plan for the first time.  Ultimately, on or about November 12, 2020, Carson and Bermudez terminated Plaintiff's employment on behalf of Defendant RCYC.

206.     Any reasonable worker well might be dissuaded about opposing and/or supporting a charge of discrimination if she knew her supervisors would place her on a developmental plan; reprimand her for creating a platform for her subordinates to complain; and certainly if she knew her employer would terminate her employment for opposing discrimination.

207.     Plaintiff Milian's protected activity and the subsequent materially adverse actions described above are causally connected based on temporal proximity, and because the protected activity and adverse actions are not wholly unrelated.

208.      Indeed, the reprimands by Salazar and Carson are causally connected because the discipline would not have occurred but for Plaintiff Milian's protected activity.  To be sure, both Salazar and Carson were aware that Plaintiff Milian supported her agents' discrimination complaints and that she organized the meeting with Composto.

209.     Plaintiff Douglas engaged in protected activity by opposing the Company's directive to "sound British" during her sales calls.  On or about September 18, 2020 during the meeting held by Composto, Plaintiff Douglas said, "I will never sound British over the phone.  I will do my very best to pronounce my words.  I will say '*with* you,' not '*wit* you.'  I will do my best to talk properly. But I'll tell you this: I'm a salesperson and I'll get a sale … that's what I know how to do."

210.     Plaintiff Douglas further complained about the promotion of three white, European agents of herself.  Plaintiff Douglas said, "If there's no people like me [in Malta] then they're not gonna understand me, and I'm not gonna fit in … and I never want to be put in that position because of the color of my skin or how I was born."

211.     Plaintiff Douglas suffered materially adverse actions as a direct result of the above-described protected activity.  First, Bermudez told Douglas she was no longer permitted to

complain to Company executives.  Bermudez said, "Don't talk in the meetings.  Give the feedback to Frances directly."   Second, on or about October 22, 2020, Carson orchestrated a scheme to reprimand Plaintiff Douglas for a legitimate reason.  Carson insisted that Milian reprimand Plaintiff Douglas for allegedly making Davie cry at work—an event Davie herself admitted never happened.  Third, on or about October 27, 2020, Carson implored Plaintiff Douglas and the Miami Team to "be smarter with [their] time," and "Strive for excellence," and that the agents no longer allowed to express their concerns during team meetings.  Finally, on or about November 12, 2020, Defendant RCYC terminated Plaintiff Douglas's employment.

212.    Any reasonable worker might well have been dissuaded from complaining about discrimination if she knew her employer would strip her sales leads; tell her she was not allowed to complain about discrimination; that management would begin concocting schemes to falsely reprimand her; and if she knew her employer would terminate her employment because she complained about discrimination.

213.    Plaintiff Douglas's materially adverse actions are causally connected to her protected activity.   Indeed, a causal connection exists between her protected activity and subsequent actions based on temporal proximity, and because the discrimination complaints and adverse actions are not wholly unrelated.  In or around late September of 2020, Bermudez told Plaintiff Douglas not to "talk in the meetings" after Bermudez learned Douglas had complained about discrimination during the September 18, 2020 meeting.  Similarly, Salazar and Carson both commanded Douglas not to complain in the meetings.  Carson instructed Milian to reprimand Plaintiff Douglas because of her complaints.  Carson stripped Plaintiff Douglas's leads because she opposed RCYC's practices which she reasonably believed were discriminatory.  Finally, on or

about November 12, 2020, Defendant RCYC terminated Plaintiff Douglas's employment because she complained about discrimination.  Thus, Plaintiff Douglas can establish a causal nexus.

214.    Plaintiff Martinez engaged in protected activity when he told Carson he would never sound like a white European on the phone. "I'm an immigrant," Plaintiff Martinez said.  "I have an accent.  That will never change no matter how hard I try."  On or about September 9, 2020 Mr. Martinez went to have a "Coffee Chat" with Salazar to discuss Martinez's vehement opposition to Carson's directive for Martinez to sound like a white European.  Plaintiff Martinez complained about Carson's discriminatory directive during the September 18, 2020 meeting.  Plaintiff Martinez said, "[Carson] doesn't understand our language … we need somebody here in Miami that's a leader that understands our language."  Martinez complained that Milian should have been hired—or at least considered—for the promotion to management over the white, European employees who had no relevant sales experience nor any demonstrative understanding of the diversity of the Miami Team.

215.    Plaintiff Martinez suffered materially adverse actions because he engaged in the above-described protected activity.  Carson removed Mr. Martinez from participating in RCYC's team meetings.  Carson then removed Martinez from his sales duties completely, and instructed him to removed Martinez from sales completely, and commanded him to focus on customer service.  Indeed, Carson told Martinez that he could not even make a sale if one of his leads was interested.  To be sure, Carson stripped Martinez of his ability to earn commissions because of his discrimination complaints.  Further, Salazar told Ms. Milian that he was upset that Martinez complained to Carson, and that he was no longer to make complaints.

216.    These materially adverse actions are causally connected to Plaintiff Martinez's protected activity.  Defendant RCYC took these actions against Plaintiff Martinez because he

engaged in the above-described protected activity. Similarly, both Carson and Salazar were aware of Plaintiff Martinez's complaints, and initiated these adverse actions immediately following Martinez's complaints. Plaintiff Martinez's protected activity and subsequent materially adverse actions are not wholly unrelated. Indeed, these facts give rise to the reasonable inference that Plaintiff Martinez's protected activity and the subsequent materially adverse actions are causally connected.

217.    As a result of Defendant's unlawful retaliation in violation of Title VII § 200e-3(a), Plaintiffs have suffered damages.

**COUNT IV**
**Title VII, 42 U.S.C. § 2000e-2(a)**
**Disparate Treatment**
**(Plaintiff Douglas and Milian against Defendant RCYC)**

218.    Plaintiffs reincorporate the allegations contained in paragraphs 43-60, 74-132.

219.    Defendant RCYC discriminated against Plaintiffs because of their race and national origin in violation by treating Plaintiffs Douglas and Martinez less favorably than similarly situated employees because of their race and national origin.

220.    Plaintiff Douglas is black woman of Jamaican national origin and therefore is a member of a protected class.

221.    Plaintiff Douglas was qualified for her position because Defendant RCYC hired her, she was the only employee to score 100% on the assessment test, she was at the very least, the number two salesperson, and never received a negative performance review. Thus, Plaintiff Douglas satisfied RCYC's objective qualifications.

222.    Defendant RCYC had treated Plaintiff Douglas differently from similarly situated employees from the outset of her employment. For example, even though Douglas scored a 100% on the assessment test, Defendant RCYC required Douglas to go through two interviews while

non-black/Jamaican employees only had to go through one.  Defendant further treated Plaintiff Douglas differently than similarly situated employees by revealing her assessment score, notwithstanding RCYC's strict policy prohibiting revealing such information. Defendant also began gave Douglas's leads away to Navarro, depriving Plaintiff the ability to earn commission.

223.    Plaintiff Douglas suffered an adverse employment action because Defendant RCYC terminated her employment on or about November 12, 2020.

224.    Defendant RCYC treated Plaintiff Douglas less favorably than similarly situated non-black/Jamaican employees.  Defendant RCYC did not terminate non-black employees with lower sales numbers.  For example, Plaintiff Douglas had $345,897 in bookings revenue for October of 2020, while Navarro had $234,98.  Plaintiff Douglas had about $3.5 million in sales revenue through 10 months of 2020.  Moreover, Plaintiff Douglas was never investigated for mishandling client accounts—Navarro was.  Further, unlike Navarro, Plaintiff Douglas never smoked a cigar in a team meeting. Additionally, Defendant RCYC instructed Douglas not to speak in the meetings, while Defendant RCYC repeatedly encouraged Navarro to provide her feedback.

225.    These facts give rise to the reasonable inference that RCYC treated Plaintiff Douglas less favorably than similarly situated employees.

226.    Plaintiff Milian is a Hispanic woman of Cuban national origin, and therefore is a member of a protected class.

227.    Plaintiff Milian was qualified for her position because Defendant RCYC recruited and hired her based on her thirty years of cruise sales experience.

228.    Plaintiff Milian suffered an adverse employment action because Defendant RCYC terminated her employment on or about November 12, 2020.  Further, on or about August 18, 2020 Defendant changed Ms. Milian to Team Leader of the Defendant's U.S. sales.  Plaintiff Milian

suffered an adverse employment action when Defendant RCYC promoted three, white European employees—less qualified individuals—over Plaintiff Milian.

229.    Indeed, where Milian had accumulated 25 years in cruise sales experience, leading teams at NCL, and revitalizing struggling cruise lines, the three white Malta employees had never even worked in cruise sales.

230.    Defendant RCYC treated Plaintiff Milian less favorably than similarly situated employees because Defendant RCYC did not terminate similarly situated employees—like Fredericks, Salazar, and Insuasti—who supported the Company's discriminatory practices. Indeed, Defendant RCYC terminated Milian's employment because she created a platform for her agents to complain about employment practices which they reasonably believed were discriminatory.

231.    Taken together, these allegations give rise to the reasonable inference that Defendant RCYC treated Plaintiff Douglas and Plaintiff Milian less favorably than similarly situated employees because of their race and national origin.

232.    Plaintiff Douglas and Plaintiff Milian have suffered damages as a result of Defendant RCYC's intentional discrimination in violation of Title VII.

**COUNT V**
**FCRA § 760.10(1)(a)**
**Disparate Treatment**
**(Plaintiff Douglas and Milian against Defendant RCYC)**

233.    Plaintiffs reincorporate the allegations in paragraphs 43-60, 74-132.

234.    Defendant RCYC discriminated against Plaintiffs because of their race and national origin by treating Plaintiffs Douglas and Martinez less favorably than similarly situated employees because of their race and national origin.

235.    Plaintiff Douglas is black woman of Jamaican national origin and therefore is a member of a protected class.

236.    Plaintiff Douglas was qualified for her position because Defendant RCYC hired her, she was the only employee to score 100% on the assessment test, she was at the very least, the number two salesperson, and never received a negative performance review.  Thus, Plaintiff Douglas satisfied RCYC's objective qualifications.

237.    Defendant RCYC had treated Plaintiff Douglas differently from similarly situated employees from the outset of her employment.  For example, even though Douglas scored a 100% on the assessment test, Defendant RCYC required Douglas to go through two interviews while non-black/Jamaican employees only had to go through one.  Defendant further treated Plaintiff Douglas differently than similarly situated employees by revealing her assessment score, notwithstanding RCYC's strict policy prohibiting revealing such information. Defendant also began gave Douglas's leads away to Navarro, depriving Plaintiff the ability to earn commission.

238.    Plaintiff Douglas suffered an adverse employment action because Defendant RCYC terminated her employment on or about November 12, 2020.

239.    Defendant RCYC treated Plaintiff Douglas less favorably than similarly situated non-black/Jamaican employees.  Defendant RCYC did not terminate non-black employees with lower sales numbers.  For example, Plaintiff Douglas had $345,897 in bookings revenue for October of 2020, while Navarro had $234,98.  Plaintiff Douglas had about $3.5 million in sales revenue through 10 months of 2020.  Moreover, Plaintiff Douglas was never investigated for mishandling client accounts—Navarro was.  Further, unlike Navarro, Plaintiff Douglas never smoked a cigar in a team meeting. Additionally, Defendant RCYC instructed Douglas not to speak in the meetings, while Defendant RCYC repeatedly encouraged Navarro to provide her feedback.

240.     These facts give rise to the reasonable inference that RCYC treated Plaintiff Douglas less favorably than similarly situated employees.

241.     Plaintiff Milian is a Hispanic woman of Cuban national origin, and therefore is a member of a protected class.

242.     Plaintiff Milian was qualified for her position because Defendant RCYC recruited and hired her based on her thirty years of cruise sales experience.

243.     Plaintiff Milian suffered an adverse employment action because Defendant RCYC terminated her employment on or about November 12, 2020.  Further, on or about August 18, 2020 Defendant changed Ms. Milian to Team Leader of the Defendant's U.S. sales.  Plaintiff Milian suffered an adverse employment action when Defendant RCYC promoted three, white European employees—less qualified individuals—over Plaintiff Milian.

244.     Indeed, where Milian had accumulated 30 years in cruise sales experience, leading teams at NCL, and revitalizing struggling cruise lines, the three white Malta employees had never even worked in cruise sales.

245.     Defendant RCYC treated Plaintiff Milian less favorably than similarly situated employees because Defendant RCYC did not terminate similarly situated employees—like Fredericks, Salazar, and Insuasti—who supported the Company's discriminatory practices. Indeed, Defendant RCYC terminated Milian's employment because she created a platform for her agents to complain about employment practices which they reasonably believed were discriminatory.

246.     Taken together, these allegations give rise to the reasonable inference that Defendant RCYC treated Plaintiff Douglas and Plaintiff Milian less favorably than similarly situated employees because of their race and national origin.

247. Plaintiff Douglas and Plaintiff Milian have suffered damages as a result of Defendant RCYC's intentional discrimination in violation of the FCRA.

## COUNT VI
### 42 U.S.C. § 1981
### Disparate Treatment
### (Plaintiff Douglas against Defendant RCYC, Carson, and Prothero)

248. Plaintiff Douglas reincorporates the allegations in paragraphs 45-61, 114-127.

249. Defendant RCYC, Fredericks, Douglas, Carson, and Salazar intentionally discriminated against Plaintiff Douglas because of her race and ancestry in violation of § 1981.

250. Plaintiff Douglas is black woman of Jamaican national origin and therefore is a member of a protected class.

251. Plaintiff Douglas was qualified for her position because Defendant RCYC hired her, she was the only employee to score 100% on the assessment test, she was at the very least, the number two salesperson, and never received a negative performance review. Thus, Plaintiff Douglas satisfied RCYC's objective qualifications.

252. Defendant RCYC began treating Plaintiff Douglas differently from similarly situated employees from the outset of her employment. For example, even though Douglas scored a 100% on the assessment test, Defendant RCYC required Douglas to go through two interviews while non-black/Jamaican employees only had to go through one. Defendant further treated Plaintiff Douglas differently than similarly situated employees by revealing her assessment score, notwithstanding RCYC's strict policy prohibiting revealing such information. Defendant also began gave Douglas's leads away to Navarro, depriving Plaintiff the ability to earn commission.

253. Plaintiff Douglas suffered an adverse employment action because Defendant RCYC terminated her employment on or about November 12, 2020.

254.     Defendant RCYC treated Plaintiff Douglas less favorably than similarly situated non-black/Jamaican employees.  Defendant RCYC did not terminate non-black employees with lower sales numbers.  For example, Plaintiff Douglas had $345,897 in bookings revenue for October of 2020, while Navarro had $234,98.  Plaintiff Douglas had about $3.5 million in sales revenue through 10 months of 2020.  Moreover, Plaintiff Douglas was never investigated for mishandling client accounts—Navarro was.  Further, unlike Navarro, Plaintiff Douglas never smoked a cigar in a team meeting. Additionally, Defendant RCYC instructed Douglas not to speak in the meetings, while Defendant RCYC repeatedly encouraged Navarro to provide her feedback.

255.     These facts give rise to the reasonable inference that RCYC treated Plaintiff Douglas less favorably than similarly situated employees.

256.     Plaintiffs have suffered damages as a result of Defendant RCYC's employment practices in violation of § 1981.

### COUNT VII
### Title VII, 42 U.S.C. § 2000e-2(a)
### Hostile Work Environment – National Origin
### (Plaintiff Douglas and Martinez against Defendant RCYC)

257.     Plaintiff reincorporates the allegations in paragraphs 74-130.

258.     Defendant RCYC discriminated against Plaintiffs because of their national origin by subjecting Plaintiffs to relentless harassment because of their national origin, including their linguistic characteristics.

259.     Defendant RCYC's employment practices described throughout this complaint had the purpose or effect of unreasonably interfering with Plaintiffs' work performance.

260.     Throughout the summer of 2020, Defendant RCYC launched an unrelenting campaign to whitewash the immutable characteristics of the Miami Team because of their

respective races and/or national origins.  RCYC's first target was Plaintiff Douglas—their top sales agent, the one who brought in the most revenue for a company that was desperate for cash.

261.    For example, on or about July 20, 2020, Fredericks told Plaintiff Douglas, "I know you mean well, but you need to change your speech on the calls."  Fredericks said, "it's not 'wit you,' it's 'with you.'"

262.    During daily meetings beginning in or around August of 2020, at the direction of Prothero and Carson, Salazar and Fredericks implored Plaintiff Douglas and Martinez that the Miami Team needed to sound more "refined," "upscale," and "ritzy."

263.    The "Global Excellence" script unreasonably interfered with Plaintiff Martinez and Douglas's work performance because the script, along with the supplemental recordings and directive from Carson, required Martinez and Douglas to change their linguistic characteristics, which was impossible.

264.    In response, Plaintiff Martinez told Carson, "I'm an immigrant.  I have an accent. That will never change no matter how hard I try."

265.    Defendant RCYC altered the terms and conditions of Plaintiff Douglas' employment because Bermudez told Douglas, "Don't speak during the team meetings."  Likewise, after the September 18, 2020 meeting, Salazar told Milian, "It's not acceptable for your agents to express themselves and their concerns in a meeting with [Composto]."

266.    Defendants' harassment of Plaintiff was sufficiently severe or pervasive to alter the terms and conditions of Plaintiff's employment.

267.    Defendant RCYC is liable for the environment because Defendant had actual notice of Plaintiff's discrimination complaints.

268.    Defendants violated Title VII, 42 U.S.C. § 2000e-2(a) by discriminating against Plaintiffs in the terms, conditions, and privileges of their employment.

269.    As an actual and proximate result of Defendant RCYC's unlawful employment practices in violation of Title VII, Plaintiffs have suffered damages.

**COUNT VIII**
**FCRA § 760.10(1)(a)**
**Hostile Work Environment – National Origin**
**(Plaintiff Douglas and Martinez against Defendant RCYC)**

270.    Plaintiffs reincorporate the allegations in paragraphs 74-130.

271.    Defendant RCYC discriminated against Plaintiffs because of their national origin by subjecting Plaintiffs to relentless harassment because of their national origin, including their linguistic characteristics.

272.    Defendant RCYC's employment practices described throughout this complaint had the purpose or effect of unreasonably interfering with Plaintiffs' work performance.

273.    Throughout the summer of 2020, Defendant RCYC launched an unrelenting campaign to whitewash the immutable characteristics of the Miami Team because of their respective races and/or national origins.  RCYC's first target was Plaintiff Douglas—their top sales agent, the one who brought in the most revenue for a company that was desperate for cash.

274.    For example, on or about July 20, 2020, Fredericks told Plaintiff Douglas, "I know you mean well, but you need to change your speech on the calls."  Fredericks said, "it's not 'wit you,' it's 'with you.'"

275.    During daily meetings beginning in or around August of 2020, at the direction of Prothero and Carson, Salazar and Fredericks implored Plaintiff Douglas and Martinez that the Miami Team needed to sound more "refined," "upscale," and "ritzy."

276.     The "Global Excellence" script unreasonably interfered with Plaintiff Martinez and Douglas's work performance because the script, along with the supplemental recordings and directive from Carson, required Martinez and Douglas to change their linguistic characteristics, which was impossible.

277.     In response, Plaintiff Martinez told Carson, "I'm an immigrant.  I have an accent. That will never change no matter how hard I try."

278.     Defendant RCYC altered the terms and conditions of Plaintiff Douglas' employment because Bermudez told Douglas, "Don't speak during the team meetings."  Likewise, after the September 18, 2020 meeting, Salazar told Milian, "It's not acceptable for your agents to express themselves and their concerns in a meeting with [Composto]."

279.     Defendants' harassment of Plaintiff was sufficiently severe or pervasive to alter the terms and conditions of Plaintiff's employment.

280.     Defendant RCYC is liable for the environment because Defendant had actual notice of Plaintiff's discrimination complaints.

281.     Defendants violated the FCRA by discriminating against Plaintiffs in the terms, conditions, and privileges of their employment.

282.     As an actual and proximate result of Defendant RCYC's unlawful employment practices, Plaintiffs have suffered damages.

**COUNT IX**
**42 U.S.C. § 1981**
**Hostile Work Environment – Race**
**(<u>Plaintiff Douglas against Defendant RCYC and Fredericks</u>)**

283.     Plaintiff Douglas reincorporates paragraphs 45-62, 76-86, 100-106.

284.     §1981 prohibits employment discrimination in an individual's terms, conditions, and privileges of employment because of the individual's race.

285.     Plaintiff Douglas is a black and therefore is a protected class member.

286.     Defendant RCYC and Fredericks subjected Plaintiff Douglas to repeated discriminatory conduct throughout the course of her employment.  Such conduct was pervasive, humiliating, and, as described throughout this Complaint, objectively and subjectively offensive.

287.     Fredericks required Ms. Douglas to go through two interviews while other non-black/Jamaican candidates only had to go through one.  Fredericks announced Douglas's 100% on the assessment test as a means of justifying hiring her.  Fredericks violated RCYC policy by disclosing Douglas's score because RCYC maintained a rule that employee's scores were private.

288.     Hence, the above treatment because of Plaintiff's race necessarily altered the terms and conditions of her employment.

289.     Fredericks humiliated Plaintiff Douglas by repeatedly making offensive and unwanted discriminatory comments toward Douglas because of her race.  Indeed, on at least three separate occasions Fredericks asked Douglas if she "lived in the ghetto," or questioned that there was "no way [she] owned a house."  Douglas would remind Fredericks, "No, David.  I do not live in the ghetto."  Douglas would say, "I live in a house.  I am educated and my parents paid for private school."

290.     Fredericks reduced Plaintiff Douglas to tears multiple times because of her race. He would shout at her and say, "Bianca, you're here to do your job—keep your mind out of other people's business," to protect Navarro, a non-black/Jamaican employee.

291.     Fredericks was disgusted when Plaintiff Douglas would even try to suggest she could do anything to help RCYC's sales numbers.  Fredericks would say, "Bianca, you don't know me like that."  Yet, during that same meeting, Fredericks would praise Navarro when she asked a

question or made a comment.  For instance, Fredericks would smile and say, "Thank you for your feedback, Mari."

292.    In or around late January of 2020, shortly after Defendant reinstated Navarro, Ms. Douglas overheard Navarro complaining to Fredericks that Ms. Douglas was "too loud."

293.    On or about July 20, 2020, Fredericks told Plaintiff Douglas, "I know you mean well, but you need to change your speech on the calls."  Fredericks said, "it's not '*wit* you,' it's '*with* you.'"  Fredericks and the Company did not see Douglas as the number 2 sales agent at the Company, or their employee who had $3.5 million in booking revenue.

294.    On or about September 18, 2020, Plaintiff Douglas said, "I will never sound British over the phone.  I will do my very best to pronounce my words.  I will say '*with* you,' not '*wit* you.'  I will do my best to talk properly."

295.    Defendants' harassment of Plaintiff Douglas was sufficiently severe or pervasive to alter the terms and conditions of her employment.

296.    Defendant RCYC is liable for the environment because Defendant had actual notice of Plaintiff's discrimination complaints.

297.    Defendants violated the § 1981 by discriminating against Plaintiff Douglas with respect to the terms, conditions, and privileges of their employment.

298.    As an actual and proximate result of Defendant RCYC's unlawful employment practices, Plaintiffs have suffered damages.

<u>**COUNT X**</u>
**Title VII, 42 U.S.C. § 2000e-2(a)**
**Retaliatory Hostile Work Environment**
<u>**(Plaintiffs against Defendant RCYC)**</u>

299.    Plaintiffs reincorporate the allegations in paragraphs 76-134.

300.     Defendant RCYC subjected Plaintiffs to a retaliatory hostile work environment by altering the terms and conditions of Plaintiffs' employment because they engaged in protected activity by opposing what they reasonably believed to be discriminatory employment practices.

301.     Plaintiff Douglas Plaintiff Douglas engaged in protected activity by opposing the discriminatory practices with respect to the sales script and Defendant RCYC's expectations for how the Company wanted Plaintiff Douglas to sound on the calls.

302.     Plaintiff Douglas engaged in protected activity by complaining to the Company on or about September 18, 2020 during the meeting with Composto and Milian.  Plaintiff Douglas said, "I will never sound British over the phone.  I will do my very best to pronounce my words. I will say '*with* you,' not '*wit* you.'  I will do my best to talk properly. But I'll tell you this: I'm a salesperson and I'll get a sale … that's what I know how to do."

303.     Plaintiff Douglas further complained about the language mandates.  Plaintiff Douglas said, "If there's no people like me [in Malta] then they're not gonna understand me, and I'm not gonna fit in … and I never want to be put in that position because of the color of my skin or how I was born."

304.     Any reasonable worker might well have been dissuaded from complaining about discrimination if she knew her employer would strip her sales leads; tell her she was not allowed to complain about discrimination; that management would begin concocting schemes to falsely reprimand her; and if she knew her employer would terminate her employment because she complained about discrimination.

305.     Plaintiff Martinez engaged in protected activity by complaining to Carson that he could not change his accent because it was an immutable characteristic of his race and national

origin.  In or around early September of 2020, Martinez said, "I'm an immigrant.  I have an accent.  That will never change no matter how hard I try."

306.     Consequently, Carson removed Plaintiff Martinez from sales, and moved him to customer service, directly impacting the terms and conditions of Plaintiff Martinez's employment.

307.     Plaintiff Milian engaged in protected activity on or about September 18, 2020 by approaching Composto and explaining her team was offended by the Company's directive for the agents to change their dialects.  Plaintiff Milian engaged in further protected activity on or about October 28, 2020 when she complained to Carson and Bermudez about a hostile work environment.

308.     Plaintiff Milian suffered a materially adverse action when Salazar told Milian, "It's not acceptable for your agents to express themselves and their concerns in a meeting with [Composto]."   Salazar reprimanded Milian, saying, "The fact that your agents expressed themselves shows you have zero control over this team."  Salazar made clear the Company would not tolerate discrimination complaints.  Salazar said, "People have to do what they are told—no questions asked."  Then, or about September 30, 2020, Carson placed Milian on a development action plan for the first time.  On or about November 12, 2020, Carson and Bermudez terminated Plaintiff Milian's employment.

309.     Any reasonable worker would be dissuaded about opposing and/or supporting a charge of discrimination if she knew her supervisors would reprimand her, stating she could not control her subordinates, if she knew her employer would placed her on a developmental plan, and certainly if she knew her employer would terminate her employment for opposing discrimination.

310. Plaintiff Milian's protected activity and the subsequent materially adverse actions are causally connected based on temporal proximity, and because the protected activity and adverse actions are not wholly unrelated.

311. Indeed, the reprimands by Salazar and Carson are causally connected because the discipline would not have occurred but for Plaintiff Milian's protected activity. To be sure, both Salazar and Carson were aware that Plaintiff Milian organized the meeting with Composto and the Miami Team, and disciplined her because of such activity.

312. Hence, the above gives rise to the reasonable inference that Defendant RCYC subjected Plaintiffs to a retaliatory hostile work environment in violation of Title VII.

313. Plaintiffs have been damaged by Defendant RCYC's employment practices.

**COUNT XI**
**FCRA § 760.10(1)(a)**
**Retaliatory Hostile Work Environment**
**(Plaintiffs against Defendant RCYC)**

314. Plaintiffs reincorporate the allegations in paragraphs 76-134.

315. Defendant RCYC subjected Plaintiffs to a retaliatory hostile work environment by altering the terms and conditions of Plaintiffs' employment because they engaged in protected activity by opposing what they reasonably believed to be discriminatory employment practices.

316. Plaintiff Douglas Plaintiff Douglas engaged in protected activity by opposing the discriminatory practices with respect to the sales script and Defendant RCYC's expectations for how the Company wanted Plaintiff Douglas to sound on the calls.

317. Plaintiff Douglas engaged in protected activity by complaining to the Company on or about September 18, 2020 during the meeting with Composto and Milian. Plaintiff Douglas said, "I will never sound British over the phone. I will do my very best to pronounce my words.

I will say '*with* you,' not '*wit* you.'  I will do my best to talk properly. But I'll tell you this: I'm a salesperson and I'll get a sale … that's what I know how to do."

318.    Plaintiff Douglas further complained about the language mandates.  Plaintiff Douglas said, "If there's no people like me [in Malta] then they're not gonna understand me, and I'm not gonna fit in … and I never want to be put in that position because of the color of my skin or how I was born."

319.    Any reasonable worker might well have been dissuaded from complaining about discrimination if she knew her employer would strip her sales leads; tell her she was not allowed to complain about discrimination; that management would begin concocting schemes to falsely reprimand her; and if she knew her employer would terminate her employment because she complained about discrimination.

320.    Plaintiff Martinez engaged in protected activity by complaining to Carson that he could not change his accent because it was an immutable characteristic of his race and national origin.  In or around early September of 2020, Martinez said, "I'm an immigrant.  I have an accent. That will never change no matter how hard I try."

321.    Consequently, Carson removed Plaintiff Martinez from sales, and moved him to customer service, directly impacting the terms and conditions of Plaintiff Martinez's employment.

322.    Plaintiff Milian engaged in protected activity on or about September 18, 2020 by approaching Composto and explaining her team was offended by the Company's directive for the agents to change their dialects.  Plaintiff Milian engaged in further protected activity on or about October 28, 2020 when she complained to Carson and Bermudez about a hostile work environment.

323. Plaintiff Milian suffered a materially adverse action when Salazar told Milian, "It's not acceptable for your agents to express themselves and their concerns in a meeting with [Composto]." Salazar reprimanded Milian, saying, "The fact that your agents expressed themselves shows you have zero control over this team." Salazar made clear the Company would not tolerate discrimination complaints. Salazar said, "People have to do what they are told—no questions asked." Then, or about September 30, 2020, Carson placed Milian on a development action plan for the first time. On or about November 12, 2020, Carson and Bermudez terminated Plaintiff Milian's employment.

324. Any reasonable worker would be dissuaded about opposing and/or supporting a charge of discrimination if she knew her supervisors would reprimand her, stating she could not control her subordinates, if she knew her employer would placed her on a developmental plan, and certainly if she knew her employer would terminate her employment for opposing discrimination.

325. Plaintiff Milian's protected activity and the subsequent materially adverse actions are causally connected based on temporal proximity, and because the protected activity and adverse actions are not wholly unrelated.

326. Indeed, the reprimands by Salazar and Carson are causally connected because the discipline would not have occurred but for Plaintiff Milian's protected activity. To be sure, both Salazar and Carson were aware that Plaintiff Milian organized the meeting with Composto and the Miami Team, and disciplined her because of such activity.

327. Hence, the above gives rise to the reasonable inference that Defendant RCYC subjected Plaintiffs to a retaliatory hostile work environment in violation of the FCRA.

328. Plaintiffs have been damaged by Defendants' unlawful employment practices.

## COUNT XII
## FMLA, 29 U.S.C. § 2615(a)(2)
### Retaliation
### (Plaintiff Martinez against Defendant RCYC)

329.    Plaintiff Martinez reincorporates the allegations in paragraphs 136-144.

330.    The FMLA states, in pertinent part: "an eligible employee shall be entitled to a total of 12 workweeks of leave during any 12-month period … [b]ecause of a serious health condition that makes the employee unable to perform the functions of the position of such employee."

331.    The FMLA makes it illegal for an employer to "discharge or *in any other manner discriminate* against any individual for opposing any practice made unlawful by this subchapter." 29 U.S.C. § 2615(a)(2) (emphasis added).

332.    Plaintiff Martinez is an eligible employee under the FMLA because he worked for Defendant for at least 12 months when he requested FMLA leave, and because Defendant employed Plaintiff for at least 1,250 hours of service during the 12-month period immediately preceding exercising his FMLA rights.  29 U.S.C. § 2611(2)(A)(i-ii).

333.    Plaintiff worked Monday through Sunday, approximately 60 hours per week throughout the course of his employment.  Thus, Plaintiff was employed for at least 1,250 hours during the 12-month period immediately preceding exercising his FMLA rights

334.    Defendant RCYC is a covered employer by the FMLA because RCYC employed more than 50 employees within a 75-mile radius of its Miami worksite throughout 2021 and 2020.

335.    As an eligible employee, Plaintiff Martinez was entitled to a leave of absence under the FMLA because of a serious health condition that made Martinez unable to perform the functions of his job.  29 U.S.C. § 2612(a)(1)(D).

336.     Plaintiff Martinez had a serious health condition because he was diagnosed with anxiety, depression, and insomnia, for which he was continuing treatment by his health care provider, Dr. Nguyen.  29 U.S.C. §2611(11).

337.     Plaintiff engaged in protected activity under the FMLA on or about November 22, 2020, when Martinez filed his FMLA paperwork with Defendant RCYC.

338.     Defendant RCYC intentionally discriminated against Plaintiff Martinez November 24, 2020, the day it approved his FMLA request.

339.     Indeed, on or November 24, 2020, Plaintiff Martinez's booked guests contacted Martinez on his personal cellphone that various clients texted and called Plaintiff Martinez asking if he was still employed by RCYC.  Plaintiff Martinez's guests told him that RCYC had informed them that Plaintiff Martinez was "no longer employed" by RCYC.

340.     Plaintiff Martinez emailed Bermudez to ask her what was going on because he understood that he could not earn the commission from his guests (any of them) if the guests were no longer his clients.

341.     Consequently, Defendant RCYC directly deprived Plaintiff Martinez of his compensation because he could not receive his compensations unless the clients were his own.

342.     These are materially adverse actions because any reasonable worker in Plaintiff Martinez's position well might be dissuaded from exercising rights under the FMLA if the person knew he would be deprived of commission and clients as a result of requesting those rights.

343.     The above materially adverse actions are causally connected to Plaintiff Martinez's FMLA request based on temporal proximity, and because his request for FMLA and the adverse actions are not wholly unrelated.  Defendant RCYC had actual knowledge of Plaintiff Martinez's

FMLA request and approved leave, and then subsequently began telling his guests that he was no longer employed.

344.    As a result of Defendant RCYC and Defendant Bermudez's retaliation in violation of 29 U.S.C. § 2615(a)(2), Plaintiff has suffered damages.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs demand judgment against Defendants, containing the following relief, respectively:

A.    As against Defendant Ritz-Carlton Yacht Collection, pursuant to FCRA § 760.11(5), Title VII § 102(b)(3), § 1981, and as against Defendant Prothero, Carson, and Salazar, pursuant to § 1981, and with respect to Plaintiff Martinez, as against Defendant Ritz-Carlton Yacht Collection, the FMLA, 29 U.S.C. § 2615(a)(2), an award of damages in an amount to be determined at trial, plus prejudgment interest to compensate Plaintiffs for all monetary and/or economic damages, including, but not limited to, the loss of past and future income, wages, compensation, commissions, job security and other benefits of employment;

B.    As against Defendant Ritz-Carlton Yacht Collection, pursuant to FCRA § 760.11(5), Title VII § 102(b)(3), and § 1981, an award of damages in an amount to be determined at trial, plus prejudgment interest to compensate Plaintiffs for future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses;

C.    As against Defendant Ritz-Carlton Yacht Collection, pursuant to FCRA §760.11(5), Title VII § 102(b)(1), 42 U.S.C. § 1981a, and as against Defendant Prothero, Fredericks, Carson, and Salazar, under 42 U.S.C. § 1981a, an award of punitive damages for

Defendants' engagement in discriminatory practices with malice or with reckless indifference to Plaintiffs' rights under federal and state law;

D.      As against Defendant Ritz-Carlton Yacht Collection, pursuant to FCRA § 760.11(5) and Title VII § 103, 42 U.S.C. § 1988(b), and, as against Defendants Prothero, Fredericks, Carson, and Salazar, pursuant to § 1988(b) and FMLA, 29 U.S.C. § 2615(a)(2), with respect to Plaintiff Martinez, an award of costs Plaintiffs have incurred in this Action, and Plaintiffs' reasonable attorneys' fees plus interest; and

E.      Such other and further relief the Court deems just and proper.

## JURY DEMAND

Plaintiffs hereby demand a jury trial of all issues so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure and Section 102 of the Civil Rights Act of 1991.

Dated: November 11, 2021

Respectfully submitted,

**/s/ Brett D. Kaplan**
Brett D. Kaplan, Esq.
Florida Bar No. 1031866
brett@dereksmithlaw.com
Caroline H. Miller, Esq.
Florida Bar No. 1012331
caroline@dereksmithlaw.com
**DEREK SMITH LAW GROUP, PLLC**
701 Brickell Ave., Suite 1310
Miami, Florida 33131
Telephone: (305) 946-1884
Facsimile: (305) 503-6741
*Attorneys for Plaintiffs Bianca Douglas,*
*Frances Milian, and Pablo Martinez*